# UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| STEVEN ISAACSON, SR., | ) | |
| MICHELLE ISAACSON, | ) | Case No. 11-51273-SCS |
| | ) | |
| *Debtors.* | ) | |
| | ) | |
| REGINA WEBB, | ) | |
| | ) | APN 11-05044-SCS |
| *Plaintiff.* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEVEN ISAACSON, SR., | ) | Chapter 7 |
| MICHELLE ISAACSON, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter came on for trial upon the Complaint filed on October 11, 2011, by the Plaintiff, Regina Webb ("Ms. Webb"), an unrepresented creditor, against the Defendants, Steven Isaacson, Sr., and Michelle Isaacson ("Mr. Isaacson" and "Mrs. Isaacson," respectively, who are sometimes collectively referred to as "the Debtors" or "the Isaacsons"), who are also unrepresented in this adversary proceeding. At the conclusion of the trial held on March 23, 2012, the Court took this matter under advisement. The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a). This Memorandum Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as incorporated into the Federal Rules of Bankruptcy Procedure by Rule 7052.

## I.   The Complaint

In the Complaint, Ms. Webb recites numerous allegations and attaches various exhibits in support of her assertions that the Court should deny the dischargeability of the indebtedness owed to her by Mr. Isaacson ("Steven Isaacson Debt") and deny the Debtors' discharge.  This adversary proceeding has been highly contentious, pitting an unrepresented creditor against unrepresented debtors.[1]   The dispute arises out of a contract whereby Mr. Isaacson was to construct several cabinets for Ms. Webb's residence.  *See* Compl. ¶ 14.  Ms. Webb terminated the contract after Mr. Isaacson failed to perform according to its terms and demanded return of the contract price to no avail.  *Id.*; *see also id.* ¶ 47.  She subsequently obtained a judgment against Mr. Isaacson in state court.  *See* Compl. Exh. 4, Warrant in Debt.

The Complaint expressly sets forth two counts.  Count I of the Complaint alleges that the Steven Isaacson Debt is non-dischargeable due to "Defalcation, Deceit, Misconduct, and Dishonesty While Acting in a Fiduciary Capacity."  Although the Plaintiff does not cite the relevant statutory section in the title or body of Count I, this count arises under 11 U.S.C. § 523(a)(4).  Count II of the Complaint alleges that the Steven Isaacson Debt is non-dischargeable due to "Fraud," pursuant to 11 U.S.C. § 523(a)(2)(A).

In Count I, Ms. Webb alleges she placed "complete confidence and trust" in the Debtors, which she contends renders them fiduciaries.[2]  Compl. ¶ 43.  As to Mr. Isaacson specifically, Ms.

---

[1] The Court's docket reflects that the Debtors are represented in the main Chapter 7 bankruptcy case (11-51273-SCS) by Kim A. Lewis, Esquire, and Shanna C. Harris, Esquire, of John W. Lee, P.C., but this representation does not extend to the adversary proceeding.

[2] Ms. Webb also contends that a fiduciary relationship existed between Mr. Isaacson and two other former customers, Deborah Viviani and Rose McDowell.  *See* Compl. ¶ 42.  To the extent Ms. Webb seeks relief on the basis of Mr. Issacson's alleged fiduciary relationship with Ms. Viviani or Ms. McDowell, there are no facts before the Court that would give Ms. Webb

Webb asserts that he had the "power and obligation" to act for or on her behalf. *Id.* at ¶ 44. She further alleges that Mr. Isaacson, while acting as a fiduciary, received $4,105.00 from her and retained such funds for his benefit and to her detriment. *Id.* ¶¶ 47-48. Ms. Webb makes similar allegations elsewhere in the Complaint. *See id.* ¶¶ 7, 10-11, 60.

In Count II, Ms. Webb makes numerous vague assertions but offers no factual allegations in support of her claim for relief pursuant to Section 523(a)(2)(A). However, Ms. Webb includes the following general allegations elsewhere in the Complaint, which appear to relate to Count II: 1) Mr. Isaacson "would not honor the contract nor would he complete the work which is a violation of § 523(a)(2)(A)," *id.* ¶ 8; 2) Mr. Isaacson exceeded the thirty day period to complete the bathroom and kitchen cabinets she ordered and ninety days later, on October 6, 2007, delivered three partially finished bathroom cabinets, *id.* ¶ 14; 3) the work performed by Mr. Isaacson was substandard because he used nails instead of screws and one cabinet was not square, *id.*; and 4) that "[Mr. Isaacson] promised good work but intended all along to do defective work . . . [he] took the job planning to abandon it unfinished, and . . . intended not to finish the work or purchase the materials when he took the money." *Id.* ¶ 16.

In addition to the two counts expressly plead, allegations contained in both counts and elsewhere in the Complaint suggest that Ms. Webb seeks relief under other subsections of Section 523(a) and also seeks to deny the Debtors' discharge pursuant to Section 727. The Court's obligation to liberally construe pleadings filed by unrepresented parties is well-established throughout the case law of the Fourth Circuit Court of Appeals and the United States District Court for the Eastern District of Virginia. *See, e.g.*, *Beaudett v. City of Hampton*, 775 F.2d 1274, 1277-78 (4th Cir. 1985); *Taylor v. First Premier Bank*, 841 F. Supp. 2d 931, 933

---

standing to assert any claims on behalf of these third parties. *See Powers v. Ohio*, 499 U.S. 400, 410-11 (1991).

(E.D. Va. 2012); *McCain v. Educ. Credit Mgmt Corp.* (*In re McCain*), 353 B.R. 452, 464-65 (Bankr. E.D. Va. 2006).  As Judge Francis has aptly noted, "a *pro se* complaint . . . must be construed . . . with sufficient sensitivity 'so as to do justice' as required by Rule 8(e) of the Federal Rules of Civil Procedure. . . ."  *Carvel v. Ross*, No. 09 Civ. 0722, 2011 WL 856283, at *6 (S.D.N.Y. Feb. 16, 2011) (Report & Recommendation), *adopted by* 2011 WL 867568 (S.D.N.Y. Mar. 11, 2011) (unreported decision).  There are, however, limitations on the Court's ability to liberally construe complaints filed by *pro se* plaintiffs, as a complaint must still provide the defendants with sufficient notice of the nature and grounds for the plaintiff's claims.  *See Beaudett*, 775 F.2d at 1278.  Any complaint, regardless of the status of its proponent, must allege facts sufficient to "raise a right to relief above the speculative level."  *Murphy v. Goff*, No. 6:10-CV-00026, 2010 WL 2292130, at *4  (W.D. Va. June 7, 2010) (unreported decision) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Thus, based upon Ms. Webb's allegations and the introduction and prayer of the Complaint, the Court will infer additional counts within her Complaint pursuant to Sections 523(a) and 727(a).

The general tenor of many of Ms. Webb's allegations is that Mr. Isaacson accepted funds from Ms. Webb without any intent to perform according to the terms of the contract she entered into with Mr. Isaacson.  *See* Compl. ¶¶ 15-16, 47-48.  The Court will imply from these a claim for relief pursuant to Section 523(a)(6) and consider whether Mr. Isaacson intended to cause injury to Ms. Webb by his alleged nonperformance.

A claim for relief pursuant to Section 727(a)(4)(A) may be implied from Ms. Webb's allegations that the Debtors made false statements in their bankruptcy schedules regarding 1) a debt owed to the Hampton Roads Sanitation District, *id.* ¶¶ 21-23; 2) their intention to surrender a 2004 Jeep Grand Cherokee ("Jeep"), *id.* ¶¶ 24-25; and 3) their failure to list any businesses in

response to Question 18 of the Statement of Financial Affairs, *id.* ¶¶ 26-29.  She further alleges

that the Debtors offered false testimony concerning the Jeep at their Section 341 Meeting of

Creditors.  *Id.* ¶ 24.  Finally, Ms. Webb generally asserts that the Debtors never intended to 1)

"disclose their true income," *id.* ¶ 53; 2) "disclose their true estate value," *id.* ¶ 54; or 3) "make

true statements in their bankruptcy papers," *id.* ¶ 56.  At trial, Ms. Webb specifically contended

that the Debtors did not disclose the true value and extent of Mr. Isaacson's tools in their

bankruptcy schedules and had undisclosed income.

    While not delineated as such, Ms. Webb also appears to allege that the Debtors have

violated Section 727(a)(4)(B), which prohibits the granting of a discharge to a debtor who

"knowingly and fraudulently, in or in connection with the case presented or used a false claim"

with respect to the indebtedness to Deborah Viviani listed on Schedule F.  *See id.* ¶ 19.

    Finally, Ms. Webb offers vague general allegations that the Debtors "fraudulently

transferred, concealed, or destroyed property that should have been property of the estate," *id.* ¶

57, which appear to indicate a claim for the denial of the Debtors' discharge pursuant to Section

727(a)(2) or Section 727(a)(5).  Ms. Webb's allegations at trial that the Debtors undervalued and

failed to disclose the extent of Mr. Isaacson's tools and their income also appear to relate to a

claim for relief under these subsections.

    Thus, although the Complaint expressly sets forth only two counts, in light of the factual

allegations set forth in the Complaint and Ms. Webb's broad requests in the introductory

paragraph and prayer for relief under Sections 523(a) and 727(a) of the Bankruptcy Code, the

Court will consider whether relief may be granted pursuant to additional subsections of Section 523(a) or Section 727(a).[3]

Finally, at trial, Ms. Webb contended for the first time that, pursuant to 11 U.S.C. § 707(b), the Debtors are ineligible to file a case under Chapter 7 on the basis that their annualized current monthly income exceeds the median family income for households of similar size in the Commonwealth of Virginia. The Complaint, however, does not set forth any allegations with respect to this claim.[4]

The Isaacsons filed a hand-written answer to the Complaint, denying most of Ms. Webb's allegations and her entitlement to have this Court deny the dischargeability of the Steven Isaacson Debt or their discharge.

## II. Findings of Fact

Ms. Webb's evidence at trial consisted of the introduction of a number of documents and an audio recording of the Section 341 Meeting of Creditors held on August 10, 2011 ("Meeting of Creditors").[5] Principal among these exhibits was the "Contract for Cabinet Work" entered

---

[3] On the Adversary Proceeding cover sheet filed with the Complaint, Ms. Webb indicates an additional cause of action, specifically the avoidance of fraudulent transfer pursuant to 11 U.S.C. § 548. The language of the statute makes clear that this cause of action is reserved for trustees and may not be "assumed" by creditors. As such, to the extent Ms. Webb seeks relief under Section 548, that claim must be denied.

[4] The Court recognizes that the Complaint cannot fairly be construed as putting the Debtors on notice of this claim, given the lack therein of any allegations constituting grounds for relief pursuant to Section 707(b). Nevertheless, because it appears that Ms. Webb's claim that the Debtors are ineligible to proceed under Chapter 7 arises from an oversimplification of the Section 707(b) analysis, the Court will address this claim in Section III.C, *infra*, to illustrate the proper application of Section 707(b) and to resolve this claim in favor of the Debtors.

[5] No objections to the proposed exhibits of Ms. Webb were lodged by the Debtors. Accordingly, pursuant to the provisions of the Amended Pre-Trial Order entered by this Court on January 30, 2012, all of Ms. Webb's exhibits were admitted without objection. The Debtors did not introduce any exhibits at trial.

into between Ms. Webb and Mr. Isaacson, which is dated July 21, 2007 ("Cabinet Contract").

Plaintiff's Exh. 1.  The Cabinet Contract provided for Mr. Isaacson to build various bathroom

and kitchen cabinets for Ms. Webb's residence.  *Id.*  The Cabinet Contract further provided work

would be completed by August 21, 2007, at a total cost of $8,210.00, including an initial down

payment of $4,105.00 ("Down Payment"), which was paid to Mr. Isaacson by Ms. Webb on July

21, 2007.[6]  Plaintiff's Exh. 1 and Exh. 2, Check Tendered for Down Payment.  Relevant terms of

the Cabinet Contract include "business license required" and "screws−no nails."  *See* Plaintiff's

Exh 1.  At trial, Ms. Webb testified that she believed Mr. Isaacson had a fiduciary duty to her

with respect to his performance under the Cabinet Contract because she trusted him to complete

her cabinets professionally and by no later than thirty days after execution of the Cabinet

Contract.  Ms. Webb also testified that, three months after the execution of the Cabinet Contract,

Mr. Isaacson brought three unfinished bathroom vanities to her residence, one of which was

defective by being out of square and was taken back by Mr. Isaacson.  *See* Plaintiff's Exhs. 6A,

Photograph of Incomplete Downstairs Bathroom Vanity, and Exh. 6B, Photograph of Incomplete

Upstairs Bathroom Vanity.  Thereafter, on or about October 14, 2007, Ms. Webb prepared and

delivered a letter to Mr. Isaacson, which advised him of her cancellation of the Cabinet Contract

and demanded return of the Down Payment by October 19, 2007.  Plaintiff's Exh. 7, Termination

Letter.  When the Down Payment was not returned, Ms. Webb provided a second notice to Mr.

Isaacson on November 30, 2007, allowing him fifteen additional days to return the Down

Payment.  Plaintiff's Exh. 8, Notice of Default.  Failing to receive the return of the Down

Payment, Ms. Webb filed a Warrant in Debt in the General District Court of the City of

---

[6] The Cabinet Contract provides as follows with respect to payment terms: "1/2
down−$4,105.00−1/2 upon completion ck# 5137−July 21, 2007 given to Steven Isaacson to start
work (1/2 down)."  Plaintiff's Exh. 1.

Hampton, Virginia, on June 26, 2008, and obtained a judgment against Mr. Isaacson in the amount of $3,905.00, with interest at six percent from the judgment date of August 7, 2008, plus costs in the amount of $48.00.[7]  Plaintiff's Exh. 9, Webb Warrant in Debt.

Much of Ms. Webb's evidence concerned Deborah Viviani ("Ms. Viviani"), another dissatisfied customer of Mr. Isaacson.[8]  On October 11, 2010, Ms. Viviani contracted with Mr. Isaacson to repair the kitchen cabinets in her residence for $3,875.00.  Plaintiff's Exh. 13, Viviani Work Request.  Ms. Viviani was referred to Mr. Isaacson by his employer, Virginia Maid Kitchens, Inc., who advised her they did not perform cabinet repair, only construction and installation.  Plaintiff's Exh. 12A, Affidavit of Deborah Viviani–Page One.  On direct examination by Ms. Webb, Ms. Viviani testified that Mr. Isaacson's attempted repairs caused further damage to her kitchen, which, on the advice of her insurance carrier, caused her to stop payment on the check given to Mr. Isaacson for the final installment of $300.00.  As a result of the preexisting mold damage in the residence and the alleged further damage caused by Mr. Isaacson's attempted repair of the cabinets, Ms. Viviani submitted a claim to her insurance carrier, who covered the cost of total replacement of the cabinets and other repairs to the residence.  *See* Plaintiff's Exh. 15A, Insurance Company Email–Page One, and Exh. 15B, Insurance Company Email–Page Two.  Ms. Viviani further testified that she had not and would not file suit against Mr. Isaacson on the contract.

---

[7] At trial, Ms. Webb testified that she deducted $200.00 from her initial demand as her estimate of the value of the materials that Mr. Isaacson had delivered to her residence.

[8] Ms. Webb included in her exhibits a copy of a Warrant in Debt purportedly filed by a Rose B. McDowell against Mr. Isaacson in the General District Court of the City of Hampton, Virginia, which alleged that Mr. Isaacson failed to provide a television cabinet after being paid in full to build such cabinet.  Plaintiff's Exh. 11.  A judgment was entered against Mr. Isaacson in the amount of $1,675.00, plus costs, on May 24, 2007.  *Id.*  No further evidence about this work was introduced at trial.

In response to a question posed by the Court, however, Mr. Isaacson testified that the Debtors had feared litigation by Ms. Viviani because of her dissatisfaction with his work. The Debtors believed Mr. Isaacson owed Ms. Viviani money, despite Ms. Vivani's statements to them that there was no outstanding debt. Answer ¶¶ 18-19. The Debtors listed Ms. Viviani as an unsecured creditor on Schedule F as holding a claim for "Fees" in the amount of $3,800.00, incurred "11-2010" ("Viviani Claim"). Plaintiff's Exh. 17, Schedule F. At the Meeting of Creditors, Mrs. Isaacson testified, on examination by Ms. Webb, that the claim included the debt as well as "attorney fees" and "court fees." Plaintiff's Exh. 24, Audio Recording. In his testimony at the Meeting of Creditors, Mr. Isaacson characterized the debt as arising out of a "personal matter."[9] *Id.*

Ms. Webb also called Joseph Hawkins ("Mr. Hawkins") as a witness, who testified that Mr. Isaacson had previously installed cabinets for him and he had scheduled a meeting with Mr. Isaacson in August 2011 to discuss some additional work. However, the meeting never took place, and Mr. Isaacson did not perform any additional work for Mr. Hawkins. In response to a question posed by the Court as to his dealings with Mr. Hawkins, Mr. Isaacson testified that he would have referred any work to his employer, Virginia Maid Kitchens, Inc., in exchange for a commission for procuring the job.

At trial, Ms. Webb's evidence also included a copy of a business license issued to Mr. Isaacson by the City of Hampton, Virginia, for "Steve & Michelle Cabinet Shop," which lists the date business began as "04/04/2007" and its expiration as "12/31/2007" ("Business License").

---

[9] In addition to the exhibits discussed, the following exhibits admitted at trial also concern the saga of Ms. Viviani's transaction with Mr. Isaacson: Plaintiff's Exh. 12B, Affidavit of Deborah Viviani–Page Two; Plaintiff's Exh. 14, November 18, 2010 Check; Plaintiff's Exh. 16, Insurance Company Statement of Loss; Plaintiff's Exh. 18, Returned Check Notification; and Plaintiff's Exh. 19, November 6, 2012 Check.

Plaintiff's Exh. 4.    Additionally, Ms. Webb introduced into evidence a "Business Account Summary" she obtained from the City of Hampton that categorizes the Business License as "Contractors Generally" and has on its face "Began Date 4/4/2007" and "Ceased Date 6/4/2007." Plaintiff's Exh. 5.    Based upon this information, Ms. Webb contends that Mr. Isaacson did not have a valid business license with the City of Hampton at the time of the Cabinet Contract.[10]    In response to questions posed by the Court, however, Mr. Isaacson testified that he had a valid business license from the City of Hampton, Virginia, at the time he entered into the Cabinet Contract with Ms. Webb, but that he turned in his business license and ceased doing business following Ms. Webb's termination of the Cabinet Contract in late 2007.    Mr. Isaacson further testified that he has never had a Virginia contractor's license as it was not required for the cabinet building and installation he performed.

Ms. Webb also introduced several exhibits at trial that she contended support her allegations that the Debtors 1) mischaracterized a debt scheduled on their bankruptcy schedules as owed to the Hampton Roads Sanitation District, *see* Plaintiff's Exh. 17, Schedule F; 2) made

---

[10] Ms. Webb alleges in the Complaint that, in addition to the Business License, Mr. Isaacson obtained other business licenses in 2005 and 2006.  However, she did not introduce any further argument or evidence as to these allegations at trial.  In the Complaint, Ms. Webb first alleges that Mr. Isaacson had a business license issued by the City of Hampton for the year 2006. Compl. ¶ 27.  Ms. Webb attached a copy of a Business License issued by the City of Hampton for the business "Steves (*sic*) Cabinet Installation & Trim Work" for the period beginning "01/01/2006" and ending "12/31/2006" to the Complaint as Exhibit 14.  In the Answer, the Debtors deny that Mr. Isaacson was engaged in any self-employment with respect to this business license and state that Mr. Isaacson was an employee of Moore's Custom Kitchens until May 11, 2006, at which time he became unemployed due to an injury.  Answer ¶ 27.  Ms. Webb also alleges that Mr. Isaacson had a business license issued by the City of Newport News, Virginia, in 2005, with the license number 652720.  Compl. ¶ 28.  Ms. Webb did not attach any exhibits to the Complaint in support of this allegation with the exception of an identical allegation set forth in the Affidavit of Deborah Viviani.  *See* Compl., Exhibit 6A, Affidavit of Deborah Viviani–Page One.  However, as to the business license issued by the City of Newport News, the Debtors admit that Mr. Isaacson "did have a license and self-employed 2005-2006," and further state that such self-employment "put more money out than brought in."  Answer ¶ 28.

false statements at the Meeting of Creditors that they intended to surrender their Jeep, *see* Plaintiff's Exh. 20, Payment Coupons, and Exh. 24, Audio Recording; and 3) failed to schedule in the Statement of Financial Affairs the nature, location and name of certain businesses in which Mr. Isaacson was self-employed in the six years preceding the filing of the bankruptcy petition, *see* Plaintiff's Exh. 23, Question 18 of the Statement of Financial Affairs.   Ms. Webb also testified that she believes Mr. Isaacson failed to accurately schedule the value of his tools and has undisclosed income.   In support of this contention, Mrs. Isaacson introduced the testimony of the Debtors at the Meeting of Creditors.   *See* Plaintiff's Exh. 24.

Based upon the contents of the Complaint and the evidence adduced at trial, and in light of the fact that Ms. Webb is proceeding *pro se*, the Court will consider her claims pursuant to Section 523(a) of the Bankruptcy Code, both expressly set forth and implied in the Complaint, as well as her claim that the Debtors should be denied their discharge pursuant to Section 727 of the Bankruptcy Code.   Finally, the Court will address Ms. Webb's contention, raised for the first time at trial, that the Debtors are ineligible to proceed under Chapter 7 of the Bankruptcy Code.

### III. Conclusions of Law

A. Nondischargeability of the Steven Isaacson Debt Pursuant to 11 U.S.C. § 523(a)

A court will not declare a debt nondischargeable pursuant to Section 523(a) unless the plaintiff can establish that the debt should be excepted from discharge by a preponderance of the evidence.   *Grogan v. Garner*, 498 U.S. 279, 291 (1991).   Courts must narrowly construe the exceptions to discharge enumerated in Section 523 to "protect the [Bankruptcy Act's] purpose of providing debtors a fresh start."   *Kubota Tractor Corp. v. Strack* (*In re Strack*), 524 F.3d 493, 497 (4th Cir. 2008) (quoting *Foley & Lardner v. Biondo* (*In re Biondo*), 180 F.3d 126, 180 (4th Cir. 1999)) (internal marks omitted).

11

The Court will consider Ms. Webb's claims expressly set forth in the Complaint that the Steven Isaacson Debt is not dischargeable due to false pretenses, a false representation, or actual fraud, and fraud or defalcation by a fiduciary pursuant to Sections 523(a)(2)(A) and 523(a)(4), respectively.  Additionally, affording due sensitivity to Ms. Webb's *pro se* status, the Court will consider Ms. Webb's claim that the Steven Isaacson Debt is not dischargeable pursuant to Section 523(a)(6), which excepts from discharge debts arising from willful or malicious injury by a debtor.

1.  Section 523(a)(2)(A)

Section 523(a)(2)(A) operates to except from discharge debts in which the debtor used fraudulent means to obtain money, property, services, or credit.  *Nunnery v. Rountree* (*In re Rountree*), 478 F.3d 215, 219 (4th Cir. 2007).[11]  An objecting creditor must establish that the debtor made a false representation, knew that the representation was false, and intended to deceive the creditor.  *Id.* at 218.  The creditor must also establish his own justifiable reliance on the representation and that he was damaged as a proximate result of the false representation.  *Id.* In cases involving defaulting contractors, fraud is generally shown in one of two manners:

> In cases such as this one involving contractor-debtors, there are generally two ways to prove fraud or misrepresentation. *Commonwealth of Pennsylvania v.*

---

[11] Section 523(a)(2)(A) provides:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

. . . .

>   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

>>    (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . .

12

*Burns* (*In re Burns*), 2008 WL 2782659, at *3, 2008 Bankr. LEXIS 3924, at *10 (Bankr. M.D. Pa. July 11, 2008). "First, to show that the debtor entered into the contract with the intent of never complying with the terms; or second, that there was an intentional misrepresentation as to a material fact or qualification when soliciting or obtaining the work." *Id.* (citing *In re Antonious*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006)); *see also, e.g.*, *Spinoso v. Heilman* (*In re Heilman*), 241 B.R. 137, 150 (Bankr. D. Md. 1999) ("For a breach of contract to result in a nondischargeable debt, the debtor must have misrepresented his or her intention to perform contractual duties, which may be inferred if the debtor failed to begin performance."); *Czech v. Sieber* (*In re Sieber*), 2009 WL 4017971, 2009 Bankr. LEXIS 886 (Bankr. D. Md. Mar. 30, 2009). "Generally, when determining whether a contractor committed fraud in connection with a construction project, the question pivots on whether during the negotiations the contractor induced the property owner into signing the contract by making material false representations, like promising to obtain the necessary permits or overstating his qualifications." *Id.*, 2008 WL 2782659, at *4, 2008 Bankr. LEXIS 3924, at *12. Substandard performance or a mere breach of the construction contract do not rise to the level of fraud necessary to except the debt from discharge.

*Scheidelman v. Henderson* (*In re Henderson*), 423 B.R. 598, 622 (Bankr. N.D.N.Y. 2010). In the instant case, Ms. Webb has alleged both that Mr. Isaacson never intended to perform under the Cabinet Contract and that he misrepresented the status of the Business License.

    a.   Did Mr. Isaacson Not Intend to Perform Under the Cabinet Contract?

Ms. Webb apparently contends that Mr. Isaacson's tardy and incomplete performance under the contract, his use of nails instead of screws on the cabinetry, and the defective nature of one of the delivered vanities due to its lack of squareness are ample proof that Mr. Isaacson never intended to perform under the Cabinet Contract. Ms. Webb offered no further evidence in support of her contention that Mr. Isaacson entered into the Cabinet Contract with no intent to perform thereunder.[12]

---

[12] Ms. Webb introduced evidence that one other customer of Mr. Isaacson, Rose B. McDowell, obtained a judgment in a Virginia state court, Plaintiff's Exh. 11, and produced a second customer, Ms. Viviani, to testify as to her dissatisfaction with Mr. Isaacson's performance. None of this evidence provides any proof that Mr. Isaacson never intended to perform on the Cabinet Contract. Additionally, Ms. Webb's judgment was obtained in a court not of record, and there is no evidence of any findings made by the state court judge that might

It is important to recall that the appropriate time to measure the intent of a debtor not to perform a contract is at the moment of its formation. *Wallace v. Perry* (*In re Perry*), 423 B.R. 215, 283 (Bankr. S.D. Tex. 2010) ("A fraud cause of action may be based upon a promise of future performance that a defendant never intended to honor. Failure to perform must be coupled with a finding of a lack of intention to perform the contract at the time of formation.") (internal citations omitted) (applying Texas law).

The Fourth Circuit Court of Appeals has cautioned at inferring fraudulent intent from non-performance of a contract:

> [The Plaintiff's] evidence of fraudulent intent thus amounts to nothing more than Viasource's complete failure to perform two contractual obligations and its partial failure to perform two others. This evidence is insufficient to allow a reasonable jury to infer that the Viasource defendants never intended for Viasource to perform its obligations under the Agreement. Indeed, Viasource's partial performance of the Agreement makes such an inference unreasonable. *Cf. Powers v. British Vita, P.L.C.*, 57 F.3d 176, 185 (2d Cir. 1995) ("[I]ntent may be found when a defendant violates an agreement so maliciously and so soon after it is made that his desire to do so before he entered into the agreement is evident."). Moreover, even had there been no partial performance, the mere failure to perform contractual obligations is not enough evidence for a jury reasonably to infer fraudulent intent on the part of the breaching party. *See Patrick*, 369 S.E.2d at 164 (holding that the evidence of mere failure to perform a contractual obligation "is insufficient as a matter of law to show . . . [an] intent to defraud at the time . . . the promise [was made]"); *Powers*, 57 F.3d at 185 ("[T]he mere non-performance of promises is insufficient to create an inference of fraudulent intent." (quotation marks omitted)). Otherwise, plaintiffs could convert every breach of contract action into an action for fraud. Accordingly, we hold that [the Plaintiff] has not raised a material issue of fact as to whether the Viasource defendants secretly intended at the time they entered into the Agreement that Viasource would renege on its contractual obligations. Without a secret intent not to perform, the Viasource defendants did not make a misrepresentation of a material fact at the time they entered into the Agreement.

---

be binding on Mr. Isaacson in this proceeding. *See* Va. Code Ann. § 16.1-69.5 (defining "Courts not of record" to include General District Courts).

*Poth v. Russey*, 99 F. App'x. 446, 454 (4th Cir. 2004) (unpublished decision). The Fourth

Circuit Court of Appeal's reasoning in *Poth*, as applied to the instant facts, belies any finding

that Mr. Isaacson had no intention to perform under the Cabinet Contract at the time of its

formation based upon the belated and incomplete nature of his performance, the deficiency of

such performance notwithstanding. Another court has noted:

> [The debtor] substantially performed his obligations pursuant to the
> Purchase Agreement. In Texas, partial performance of an agreement refutes an
> assertion that there was no intent to perform. *See Bank One, Tex., N.A. v. Stewart*,
> 967 S.W.2d 419, 445-46 (Tex. App.- Houston [14th Dist.] 1998, pet. denied).
> Here, [the debtor] substantially performed the obligations of the Purchase
> Agreement. In the suit at bar, among other things, [the debtor] purchased–and
> paid for–the other Partnership interests for $450,000.00. [Finding of Fact No.
> 39.] His payment of $450,000.00 reflects [the debtor's] intent to honor the
> obligations under the Purchase Agreement at the time of execution.
>
> Moreover, [the debtor's] subsequent breach is not adequate evidence of
> fraudulent inducement. A person commits fraud when he enters into a contract
> that he does not intend to perform; a person merely breaches a contract when he
> enters into that contract and later decides not to perform. *See Tony Gullo Motors
> I, LP v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006). Here, [the debtor] performed,
> to a certain extent, the obligations under the Purchase Agreement and only later
> breached specific provisions. The breach of contract after partial performance
> shows that [the debtor] intended to perform the contract in its entirety at the time
> he signed the Purchase Agreement.

*In re Perry*, 423 B.R. at 284. Here, the testimony of both Ms. Webb and Mr. Isaacson establish

that Mr. Isaacson constructed and delivered to Ms. Webb some of the cabinets required under the

Cabinet Contract, which, similar to the debtor in *In re Perry*, demonstrates his intent to perform

under the Cabinet Contract. The deficiencies in the construction of the cabinets and Mr.

Isaacson's subsequent failure to complete performance placed him in breach of the Cabinet

Contract but do not constitute evidence of fraudulent intent. Two other factors further weaken

Ms. Webb's argument that Mr. Isaacson entered into the Cabinet Contract with no intent to

perform. First, notwithstanding the provisions of the Cabinet Contract, Mr. Isaacson appears to

have had a belief that he had not obligated himself to perform the Cabinet Contract within thirty

days. *See* Answer ¶ 14. Additionally, Ms. Webb did terminate the Cabinet Contract after the

partial performance of Mr. Isaacson, which caused him to suspend work thereunder, and the

record is unclear as to what performance Mr. Isaacson intended after delivery of the vanities to

Ms. Webb. Accordingly, Ms. Webb has adduced insufficient proof that Mr. Isaacson committed

fraud by never intending to perform under the Cabinet Contract at the time of its formation. As a

result, she cannot establish the remaining required elements for a cause of action based upon this

argument.

b.  Did Mr. Isaacson Not Possess a Valid Business License at the Time the Cabinet Contract was
        Executed, and if not, Would This Constitute Fraud Under Section 523(a)(2)(A)?

Implicit in Ms. Webb's allegations that the Business License was not in effect at the time

of the Cabinet Contract is a claim that Mr. Isaacson committed fraud in the formation and

performance of the Cabinet Contract pursuant to Section 523(a)(2)(A) by being so unlicensed.

The Court must first consider whether the Business License was in effect at the time of

the Cabinet Contract. The Business License lists the date the business began as "04/04/2007"

and an expiration date of "12/31/2007." Plaintiff's Exh. 4. The related "Business Account

Summary" provides on its face "Began Date 4/4/2007" and "Ceased Date 6/4/2007." Plaintiff's

Exh. 5. Mr. Isaacson testified, however, that the business license remained valid until after the

termination of the Cabinet Contract. Although the "ceased date" of June 4, 2007, listed on the

Business Account Summary is prior to formation of the Cabinet Contract, in light of the

expiration date of December 31, 2007, listed on the Business License and Mr. Isaacson's

testimony that the Business License was valid until after Ms. Webb's cancellation of the Cabinet

Contract, the evidence is inconclusive as to whether the Business License was invalid.

Accordingly, Ms. Webb cannot sustain her burden to prove by a preponderance of the evidence that Mr. Isaacson violated Section 523(a)(2)(A) by reason of the invalidity of the Business License.  As a result, she also cannot prove the remaining required elements for this cause of action.

In any event, even if Ms. Webb's contention that the Business License was invalid is correct, this fact alone would not support a finding of fraud at the time of the formation of the Cabinet Contract given the nature and purpose of a city-issued business license.  This Court has previously concluded a misrepresentation of professional licensure can constitute fraud pursuant to Section 523(a)(2) in certain circumstances.  *Kendrick v. Pleasants* (*In re Pleasants*), 231 B.R. 893, 901 (Bankr. E.D. Va. 1999), *aff'd*, 219 F.3d 372 (4th Cir. 2000) (per curiam) (holding that a debt was nondischargeable pursuant to Section 523(a)(2)(A) because the debtor made false representations that he was an architect despite not having received any of the requisite training or education); *see also Peterson v. Bozzano* (*In re Bozzano*), 173 B.R. 990, 995 (Bankr. M.D.N.C. 1994), *abrogated on other grounds by Cohen v. De La Cruz*, 523 U.S. 213 (1998) (holding that the debtor's statements and conduct, which "created a false impression regarding his qualifications and abilities as a general contractor and regarding the quality of the house," constituted false representations and false pretenses).

While the misrepresentation regarding professional licensure *can* constitute fraud, the Court must examine the role such licensure has in a transaction to determine if fraud actually occurred.  This Court has previously recognized why the misrepresentation of a *professional* license constitutes fraud under Section 523(a)(2):

> [When a] debtor makes misrepresentations of his construction experience or having a necessary professional license or training to induce entry into a construction contract, the misrepresentation goes to the very essence of the agreement, i.e. the reliance by the debtor that the contracting party has the

17

> requisite knowledge, experience and training to properly construct an edifice.
> When later it appears that the promised building or dwelling is improperly
> constructed or defective, it is logical to conclude these flaws derive directly from
> the lack of professional qualifications of the debtor.

*Parker v. Grant* (*In re Grant*), 237 B.R. 97, 119 (Bankr. E.D. Va. 1999).  As Judge Bostetter

observed, "Professional licenses carry with them a degree of presumed competence, especially in

an area such as architecture, which requires years of schooling, training and the passing of an

arduous examination."  *In re Pleasants*, 231 B.R. at 898 (citing *McCain v. Fuselier* (*In re

Fuselier*), 211 B.R. 540, 545 (Bankr. W.D. La. 1997)).

       In the instant situation, the Business License cannot be conflated with a professional

license, which implies by its issuance a certain level of competence to perform duties in a

regulated profession, such as law, medicine, architecture, engineering or general contracting.

The Board of Contractors of the Virginia Department of Professional and Occupational

Regulation ("Board of Contractors") issues professional contractors licenses of various classes,

which enable those licensed to engage in contracting work within the Commonwealth of

Virginia.  Va. Code Ann. § 54.1-1103.  In contrast, a locality issues business licenses in

exchange for the payment of a tax that is levied upon "businesses, trades, professions,

occupations and callings and upon the persons, firms and corporations engaged therein" for the

privilege of conducting a trade or business within the locality.  *See* Va. Code Ann. § 58.1-

3703(A); *see also* Hampton City Code § 18.1-4(a)(2).  The interplay between professional

licensure of contractors and the issuance of a business license by a locality is described in the

Virginia Code as follows:

> Any contractor applying for or renewing a business license in any locality in
> accordance with Chapter 37 (§ 58.1-3700 *et seq.*) of Title 58.1 shall furnish prior
> to the issuance or renewal of such license either (i) satisfactory proof that he is
> duly licensed or certified under the terms of [Chapter 11 of Title 54.1] or (ii) a
> written statement, supported by an affidavit, that he is not subject to licensure or

18

certification as a contractor or subcontractor pursuant to [Chapter 11 of Title 54.1].

Va. Code Ann. § 54.1-1111(B).  Thus, professional licensure as a contractor is sufficient, but not always necessary, for the issuance of a business license by a locality in the Commonwealth of Virginia.

Mr. Isaacson testified that he has never obtained a contractor's license issued by the Board of Contractors because he believed such licensure was not required for the type of cabinet work he undertook and the relatively small amounts of revenue he generated.  Mr. Isaacson also denies that he ever held himself out to Ms. Webb as a contractor licensed in the Commonwealth of Virginia.  No evidence was presented by Ms. Webb that she inquired as to any other type of license or certification Mr. Isaacson may have held aside from the business license referenced in the Cabinet Contract.  On the basis of Mr. Isaacson's uncontroverted testimony that he has never held a professional contractor's license in the Commonwealth of Virginia, the Court must logically conclude that the City of Hampton issued the Business License on the basis that Mr. Isaacson was not subject to licensure or certification as a contractor pursuant to Va. Code Ann. § 54.1-1111(B)(ii).  Thus, even if the Business License was invalid, because the issuance of business licenses is a merely a revenue-raising mechanism that does not necessarily require professional licensure (which appears to be the case here), such invalidity could not equate to a misrepresentation of professional licensure, which could constitute fraud pursuant to Section 523(a)(2)(A).

19

### 2. Section 523(a)(4)

Ms. Webb also submits that the Court should deny the dischargeability of the Steven

Issacson Debt on the basis of fraud or defalcation by Mr. Isaacson[13] while acting in a fiduciary

capacity pursuant to Section 523(a)(4).[14] The Fourth Circuit Court of Appeals has set forth what

a plaintiff must establish to prove fraud or defalcation by a fiduciary under Section 523(a)(4):

> To prevail under this provision, a creditor must ordinarily make a two-part
> showing:  (1) that the debt in issue arose while the debtor was acting in a fiduciary
> capacity; and (2) that the debt arose from the debtor's fraud or defalcation

*Kubota Tractor Corp. v. Strack* (*In re Strack*), 524 F.3d 493, 497 (4th Cir. 2008) (citing *Pahlavi*

*v. Ansari* (*In re Ansari*), 113 F.3d 17, 20 (4th Cir. 1997)).  A fiduciary relationship must arise

from an express or technical trust.  *Pruett v. Moon* (*In re Moon*), No. 96-4086, 1997 WL

34625685, at *11 (Bankr. E.D. Va. Dec. 17, 1997) (unreported decision).  The fiduciaries

contemplated by Section 523(a)(4) are "persons in positions of ultimate trust," including "public

officers, executors, administrators, guardians, trustees of express trusts, attorneys, and corporate

directors."  *Spinoso v. Heilman* (*In re Heilman*), 241 B.R. 137, 169-70 (Bankr. D. Md. 1999).

Under Virginia law, an express trust is created under the following circumstances:

> [U]nder Virginia law, an express trust is created when the parties affirmatively
> manifest an intention that certain property be held in trust for the benefit of a third

---

[13] Ms. Webb alleges that a fiduciary relationship existed with both Debtors.  Compl. ¶ 43.
However, Mrs. Isaacson does not appear to have had any role whatsoever in the Cabinet Contract
or performance thereunder.  Accordingly, to the extent this count asserts any entitlement to relief
against Mrs. Isaacson, this portion of the Complaint must be dismissed as to her.

[14] Section 523(a)(4) also provides that debts arising from embezzlement or larceny by the
debtor are not dischargeable.  Ms. Webb made no allegations in the Complaint or at trial that the
Steven Isaacson Debt is nondischargeable pursuant to Section 523(a)(4) on the basis of
embezzlement or larceny nor was there any evidence of such submitted.  Therefore, the Court
will not consider whether the debt is nondischargeable on either of those bases.

party.  *See Peal v. Luther*, 199 Va. 35, 97 S.E.2d 668, 669 (1957).  If such a trust
is created, the beneficiary of the trust "is equitable owner of the trust property.  If
the trustee transfers the trust property . . . , or if the trustee becomes insolvent, the
beneficiary is still entitled to the property." *Broaddus v. Gresham*, 181 Va. 725,
26 S.E.2d 33, 35-36 (1943).

*In re Strack*, 524 F.3d at 498 n.8.  Judge Ellis has recently reminded of the appropriate process to

be employed to determine if a trust has been created:

> To answer the question whether a trust or a debt is created, the *Strack* opinion
> identifies three primary indicia of an intent to create an express [tr]ust rather than
> a mere debt.  They are: (i) the designated trustee lacks legal title to the property at
> issue; (ii) the trustee is restricted in his use of the property; and (iii) the property
> remains separate from the trustee's own property.

*Racetrac Petroleum, Inc. v. Khan* (*In re Khan*), 461 B.R. 343, 348 (E.D. Va. 2011).

As a consequence of the narrow definition of "fiduciary capacity," Section 523(a)(4)

excludes many ordinary commercial relationships.  *In re Moon*, 1997 WL 34625685, at *10

(citing *Teamsters Local 533 v. Schultz* (*In re Schultz*), 46 B.R. 880, 884 (Bankr. D. Nev. 1985));

*see also Zio Johnos, Inc. v. Ziadeh* (*In re Ziadeh*), 284 B.R. 893, 899 (Bankr. N.D. Iowa 2002)

(citing *Werner v. Hofmann*, 5 F.3d 1170, 1172 (8th Cir. 1993)) ("A mere contractual relationship

is less than what is required to establish the existence of a fiduciary relationship.").  Courts have

found the existence of a fiduciary relationship in the context of commercial transactions where a

fiduciary duty exists by operation of law.  *See, e.g.*, *Bodie v. Britt* (*In re Britt*), 156 B.R. 511, 519

(Bankr. E.D. Va. 1993) (holding that Virginia real estate law imposed a fiduciary responsibility

upon a real estate agent).  In the more specific context of a commercial transaction between a

contractor and a property owner, the existence of a fiduciary relationship has turned on whether

limitations were placed on the contractor's usage of monies such that an express trust was

created.  *See, e.g.*, *Lefelstein v. Donlevy* (*In re Donlevy*), 342 B.R. 774, 781 (Bankr. N.D. Ill.

2006) ("In this case, the six requirements to establish an express trust are satisfied: (1) there was

an intent to create a trust: evidenced by the contract between Defendant and the Plaintiffs wherein the Defendant was to use a 'material deposit' given to him by the Plaintiffs to pay for required materials; (2) a definite subject matter of trust property: the money Plaintiffs caused to be paid to the Defendant was specified to be used to pay for the material as required by the contract; (3) ascertainable beneficiaries: the Plaintiffs; (4) a trustee: the Defendant; (5) specifications of a trust purpose: Defendant was to pay Chicago Granite the funds for the job material; and (6) delivery of the trust property to the trustee: the check issued by the Plaintiffs was delivered to the Defendant, and was drawn on the bank account of Plaintiffs and paid."); *In re Ziadeh*, 284 B.R. at 900 ("The proposals submitted by Debtor did not impose an express or technical trust.  The proposals did not require Debtor to use these funds to pay subcontractors.  Moreover, the evidence presented does not indicate that Debtor was required to open a separate business checking account.  Finally, Debtor's mere assertions that he would use the funds provided by Plaintiff for materials and supplies does not suffice to create a fiduciary relationship.").

In the instant matter, there is no evidence that the Down Payment was paid over by Ms. Webb to Mr. Isaacson under any restrictions or understandings conditioning its use.  Rather, the Cabinet Contract simply provided the Down Payment as the initial payment thereon, to be followed by the remainder of the contracted price upon completion.  Further, there is no evidence that Mr. Isaacson did not use the Down Payment for the purpose of the work he did perform on the Cabinet Contract.  Finally, there is no provision in the Cabinet Contract or otherwise to prove (i) Mr. Isaacson lacked legal title to the Down Payment after his entry into the Cabinet Contract and receipt of the Down Payment; (ii) Mr. Isaacson was restricted in his use of the Down Payment; or (iii) the Down Payment remained separate from Isaacson's own property.

Accordingly, no fiduciary relationship was created by the Cabinet Contract and to the extent the

Complaint sounds under Section 523(a)(4), it must be dismissed.

### 3.   Section 523(a)(6)

To prevail under Section 523(a)(6), a plaintiff must prove that (1) there was an injury to

the plaintiff or his property, (2) such injury was the result of an act of the debtor, and (3) the act

was both willful and malicious.  *Lisk v. Criswell* (In *re Criswell*), 52 B.R. 184, 203 (Bankr. E.D.

Va. 1985).  Section 523(a)(6) requires more than negligent, grossly negligent or reckless conduct

by the debtor and applies only to "acts done with *the actual intent to cause injury*."  *Kawaauhau*

*v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis added).  The United States Supreme Court has

rejected a broad reading of Section 523(a)(6) that would include "situations in which an act is

intentional, but injury is unintended, *i.e.*, neither desired nor in fact anticipated by the debtor."

*Id.* at 62.  Thus, a plaintiff must demonstrate that the debtor possessed the requisite intent as to

both the act and the resultant injury.  *See id.* at 61.

In the case of a breach of contract, Section 523(a)(6) requires more than the mere fact of

the breach to render the debt nondischargeable:

> A simple breach of contract . . . , even if intentional, would not give rise to a §
> 523(a)(6) violation.  *Strum v. Exxon Co.*, 15 F.3d 327, [330] (4th Cir. 1994).  For
> the debt to be nondischargeable under § 523(a)(6), the breach must be
> accompanied by some conduct that is legally wrongful or tortuous within the
> meaning of § 523(a)(6). *Id.*

*Ocean Equity Group, Inc. v. Wooten* (*In re Wooten*), 423 B.R. 108, 130 (Bankr. E.D. Va. 2010)

(quoting *Hasalia v. Walker* (*In re Walker*), 416 B.R. 449, 468 (Bankr. W.D.N.C. 2009)).  The

United States Supreme Court has suggested that even a "knowing breach of contract" would

stretch Section 523(a)(6) too far.  *Geiger*, 523 U.S. at 62.  A breach of contract can, however,

involve conduct by the debtor that is intended or substantially certain to cause injury.  *Kforce,*

23

*Inc. v. Kearse* (*In re Kearse*), Adv. No. 09-0379PM, 2010 WL 2025518, at *2 (Bankr. D. Md.

May 18, 2010) (unreported decision) (citing *Williams v. Int'l Bhd. of Elec. Workers Local 520*

(*In re Williams*), 337 F.3d 504, 510 (5th Cir. 2003)).   In *In re Kearse*, the debtor, in breaching

her employment contract with the plaintiff, diverted the plaintiff's business opportunities to

herself and her business.  *Id.*  Accordingly, the court found that the breach of contract involved

tortious conduct by the debtor because the debtor "both desired and anticipated" the injury to the

plaintiff caused by the diverted business opportunities and, therefore, concluded the underlying

debt should be excepted from discharge under Section 523(a)(6).  *Id.* at *3.

Additionally, a debt may also be subject to nondischargeability under Section 523(a)(6) if

the facts underlying an otherwise contractually-based claim give rise to a cause of action that

sounds in tort under state law.  *See, e.g.*, *Dowdy v. Bower* (*In re Bower*), No. 97-1903, 1998 WL

372816, at *3 (4th Cir. June 5, 1998) (unpublished table decision) (observing that a wrongful

discharge claim based upon a "wrongful discharge/sex discrimination theory" constitutes

common law cause of action in tort under Virginia law).

The same allegations and responses relevant to Ms. Webb's claim pursuant to Section

523(a)(2)(A), *supra*, are relevant here as to whether the injury sustained by Ms. Webb was

"desired and anticipated" by Mr. Isaacson.  In order to prevail under Section 523(a)(6), Ms.

Webb would not only have to show that Mr. Isaacson agreed to produce satisfactory cabinets

within thirty days, but also that when he promised to do so, he did not intend to keep that

promise and that his subjective intent was to injure her.  Even if, as Ms. Webb alleges, Mr.

Isaacson intended to breach the contract by not performing as promised, Ms. Webb has failed to

plead any facts or present any evidence that he did so with the requisite willful and malicious

intent to injure her.  In contrast to the debtor in *In re Kearse*, whose diversion of the plaintiff's

24

business opportunities demanded an inference of subjective intent to cause harm, the responses contained in the Answer and the evidence adduced at trial appear to negate any specific intent of Mr. Issacson to injure Ms. Webb because Mr. Isaacson maintained that his intent was to complete the work under the Cabinet Contract on an open deadline.  That Mr. Isaacson did in fact complete some of the work and purchase some materials prior to the termination of the contract by Ms. Webb lends credibility to Mr. Isaacson's statements regarding his intent.  There is simply insufficient evidence here to conclude that Mr. Isaacson intended to willfully and maliciously injure Ms. Webb by his failure to timely and completely perform under the Cabinet Contract.  Moreover, Ms. Webb has not presented any theory of the case other than breach of contract, and it does not appear that the facts of the instant case give rise to any cause of action in tort.  Accordingly, relief pursuant to Section 523(a)(6) is not appropriate in this proceeding.

### B.  Denial of Discharge Pursuant to Section 727

The Court must grant a Chapter 7 debtor a discharge unless any of the exceptions enumerated in Section 727(a) apply.  The grounds for denial of discharge enumerated in that section are designed to prohibit the granting of a discharge to debtors who "play fast and loose with their assets or with the reality of their affairs."  *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994) (quoting *Boroff v. Tully* (*In re Tully*), 818 F.2d 106, 110 (1st Cir. 1987)).  Section 727(c) provides that "a creditor . . . may object to the granting of a discharge under subsection (a) of this section."  Because denying a debtor's discharge is an "extreme" and "drastic" penalty, objections to discharge pursuant to Section 727 are construed strictly against the objecting party and liberally in favor of the debtor.  *State Bank of India v. Chalasani* (*In re Chalasani*), 92 F.3d 1300, 1310 (2d Cir. 1996).  The party objecting to a debtor's discharge must carry the burden of proof by a preponderance of the evidence.  Fed. R. Bankr. P. 4005.

In the Complaint, Ms. Webb makes several broad allegations as to the Debtors' conduct

in their bankruptcy case:

> 53. Neither of the Debtors ever intended to disclose their true [] income.

> 54. Neither of the Debtors ever intended to disclose their true estate value.

> 55. Neither of the Debtors ever intended to produce true financial records.[15]

> 56. Neither of the Debtors ever intended to make true statements in their bankruptcy papers.

> 57. Neither of the Debtors ever intended to have the bankruptcy court question that they have fraudulently transferred, concealed, or destroyed property that should have been property of the estate.

> 58. Neither of the Debtors ever intended that the bankruptcy court have [*sic*] to take into account that the Debtors have committed a bankruptcy crime.

Compl. ¶¶ 55-58.  Ms. Webb failed to cite in her Complaint or at trial to specific objections to

discharge pursuant to Section 727.  However, in light of Ms. Webb's *pro se* status, the Court will

liberally construe the Complaint and synthesize the foregoing general allegations with the

specific facts alleged in the Complaint to imply counts objecting to discharge pursuant to Section

727(a)(4)(A) and (B), (a)(2), and (a)(5).

### 1.  Section 727(a)(4)(A)

To further the policy of "full and accurate disclosure," Section 727(a)(4)(A) operates to

deny a debtor a discharge for making a knowing and fraudulent false oath in his bankruptcy case.

*Peoples Bank of Charles Town v. Colburn* (*In re Colburn*), 145 B.R. 851, 853 (Bankr. E.D. Va.

---

[15] To the extent, by this statement, Ms. Webb is asserting a claim for relief pursuant to 11 U.S.C. § 727(a)(3) on the grounds that the Debtors failed to produce the totality of their financial records or falsified such records, she has failed to offer any factual allegations in the Complaint or at trial in support of a denial of discharge on this basis.  Thus, to the extent this statement could be construed as a claim for relief pursuant to Section 727(a)(3), it must be dismissed.

1992).  Judge Mitchell has well-summarized the requirements which must be proven to deny a

debtor's discharge by reason of a false oath:

> As the Fourth Circuit has explained, "[i]n order to be denied a discharge under this section, the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud." *Williamson v. Fireman's Fund Ins. Co.* (*In re Williamson*), 828 F.2d 249, 251 (4th Cir. 1987).  Further, "because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of a case." *Id.* at 252, *quoting In re Devers*, 759 F.2d 751, [754] (9th Cir. 1985).  Finally, "the false oath made by the debtor must have related to a material matter." *Williamson*, 828 F.2d at 251.  The subject matter of a false oath is "material," and thus sufficient to bar discharge, "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Id.* at 252, *citing Chalik v. Moorefield* (*In re Chalik*), 748 F.2d 616, 618 (11th Cir. 1984).

*Silvers v. Alanya* (*In re Alanya*), Adv. No. 09-1452, 2010 WL 5348728, at *4 (Bankr. E.D. Va.

Dec. 21, 2010) (slip copy).  Section 727(a)(4) does not, however, operate to penalize debtors for

honest mistakes or misstatements.  *Baye v. McEachern* (*In re McEachern*), No. EC-07-1419-

JuMoD, 2008 WL 8448836, at *4 n.7 (B.A.P. 9th Cir. Aug. 7, 2008) (slip copy).   To be sure,

courts acknowledge that "petitions, schedules, and statements are often filed hastily, memories

fail, and innocent mistakes and omissions can occur," and will be understanding of that reality so

long as the evidence does not reveal an underlying intent to deceive.  *See Ivey v. Anderson* (*In re

Anderson*), Adv. No. 04-2070, 2006 WL 995856, at *7 (Bankr. M.D.N.C. Feb. 13, 2006)

(unreported decision).

To prevail under Section 727(a)(4)(A), a plaintiff must prove the debtor had the intent to

defraud either through direct evidence or by pointing to specific facts and circumstances that, in

the aggregate, demonstrate a pattern of reckless disregard for the truth sufficient to warrant an

inference of fraudulent intent.  *Spencer v. Hatton* (*In re Hatton*), 204 B.R. 470, 475 (Bankr. E.D.

27

Va. 1996), *aff'd*, 204 B.R. 477 (E.D. Va. 1996) (citing *In re Colburn*, 145 B.R. at 857).

Evidence that demonstrates confusion or a believable lack of understanding on the part of a

debtor may, however, militate against an inference of fraudulent intent.  *Hatton v. Spencer* (*In re*

*Hatton*), 204 B.R. 477, 484 (E.D. Va. 1997) (citing *In re Colburn*, 145 B.R. at 858); *see also*

*Zitwer v. Kelly* (*In re Kelly*), 135 B.R. 459, 463 (Bankr. S.D.N.Y. 1992) ("[A] debtor's education

and business experience are factors to consider in determining whether he can appreciate what

information must be disclosed . . . .").  Likewise, "it is well established that the court may

consider the debtor's subsequent voluntary disclosure as evidence of innocent intent."  *In re*

*Kelly*, 135 B.R. at 461.

In addition, the false statement or omission must be material in that "it adversely affects

the ability of the trustee or creditors to fully discover the debtor's assets and financial condition."

*Jalajel v. Pugsley*, No. 1:11cv163, 2011 WL 1348312, at *2 (E.D. Va. Apr. 8, 2011) (unreported

decision) (citing *Farouki v. Emirates Bank Int'l Ltd.*, 14 F.3d 244, 251 n.19 (4th Cir. 1994)); *see*

*also In re Colburn*, 145 B.R. at 858 (concluding that certain false oaths were material "in that

they hindered creditors from discovering such assets").  Courts within the Fourth Circuit have

emphasized that a false oath that is detrimental to a trustee or creditor's discovery of assets is

material even if proper disclosure would have yielded little or no benefit to the estate and its

creditors.  *See, e.g.*, *Dean v. McDow*, 299 B.R. 133, 140 (E.D. Va. 2003) (observing there is no

"no-harm, no foul" exception); *Nesse v. Garcia* (*In re Garcia*), Adv. No. 09-0591PM, 2010 WL

4668802, at *2 (Bankr. D. Md. Nov. 9, 2010) (slip copy) (noting that a false oath need not cause

any actual detriment to creditors to be material); *Cesnick v. Cannon* (*In re Cannon*), Adv. No.

09-22, 2009 WL 2209352, at *4 (Bankr. N.D.W. Va. July 24, 2009) (unreported decision)

(recognizing that "no requirement exists that there be some detriment to a creditor resulting from

28

[a] false oath"); *First Fed. Savings and Loan Ass'n of Raleigh v. Johnson* (*In re Johnson*), 82 B.R. 801, 806 (Bankr. E.D.N.C 1988) (noting that an omission that hinders the ability of a trustee or creditor to investigate a debtor's conduct is sufficiently material even if no detriment to creditors results). *But see Blair v. Fotso* (*In re Fotso*), Adv. No. 05-09069PM, 2007 WL 3287459, at *10 (Bankr. D. Md. Nov. 2, 2007) (unreported decision) (holding that a debtor's omission of prior income from a defunct business was immaterial because disclosure would not have benefitted her creditors or the administration of the estate).

Ms. Webb generally submits that the Debtors made inaccurate disclosures and false statements in their bankruptcy schedules. Compl. ¶¶ 53-54, 56. In determining whether relief may be granted pursuant to Section 727(a)(4)(A), the Court will consider these general contentions in the context of the following specific factual allegations, by which Ms. Webb appears to contend the Debtors committed false oaths:

(1) The Debtors failed to list an account number for the claim of Hampton Roads Sanitation District ("HRSD Debt"), listed on Schedule F in the amount of $503.59, and Mrs. Isaacson's testimony at the Meeting of Creditors that such claim arose from a misreading of the Debtors' water meter, which is inconsistent with HRSD's function as a wastewater treatment facility. *See* Compl. ¶¶ 21-23.

(2) Mr. Isaacson testified at the Meeting of Creditors that the Debtors would surrender their Jeep, which is inconsistent with the Debtors' bankruptcy schedules, which sets forth in the Statement of Intention the Debtors' intent to retain the Jeep and Schedule C, in which the Debtors claim an exemption of $1.00 in the Jeep. *See id*. ¶¶ 24-25.

(3) In response to Question 18 of the Statement of Financial Affairs, the Debtors failed to disclose that Mr. Isaacson operated a business, yet he had obtained business licenses in 2005, 2006, and 2007. *See id*. ¶¶ 26-29.

(4) The Debtors underreported their income by failing to include income from "side jobs" purportedly performed by Mr. Isaacson.[16] *See id*. ¶¶ 34, 58.

---

[16] At trial, Ms. Webb attributed her general allegations that the Debtors did not disclose their true income solely to her belief that Mr. Isaacson has undisclosed income from "side jobs."

(5) The Debtors understated the value and extent Mr. Isaacson's tools on Schedule B.[17]

a.   Did the Debtors Make a False Oath as to the HRSD Debt?

Ms. Webb appears to contend that the Debtors made false oaths in connection with the HRSD Debt on the basis that 1) the Debtors omitted the account number for this claim on Schedule F and 2) Mrs. Isaacson's testimony at the Meeting of Creditors that the debt arose from a misreading of the Debtors' water meter implies either that the debt is in fact owed to a water company or that the testimony as to the genesis of the debt is false.  *See* Compl. ¶¶ 21-23.  Ms. Webb neither asserted nor adduced any evidence to suggest that the Debtors omitted the account number with any fraudulent intent.  The Court believes that it would grossly overextend the application of Section 727(a)(4)(A) to find the Debtors' failure to list an account number for the HRSD Debt constitutes an implied false statement that no account number exists or that the omission of this detail renders the HRSD Debt a falsity in its entirety.  Instead, the Court finds that the failure to list the account number for the HRSD Debt is an innocent omission of a rather inconsequential detail and concludes that such omission does not rise to the level of a false oath.  Even if the Court's conclusion is incorrect, the Debtors' failure to list the account number is immaterial as it would have no conceivable detrimental effect on the ability of Ms. Webb or any other interested party (other than, perhaps, the Hampton Roads Sanitation District entity itself) to evaluate the state of the Debtors' financial affairs.  Therefore, Ms. Webb has failed to demonstrate that the omission of the account number for the HRSD Debt constitutes a false oath.

---

[17] Ms. Webb specifically alleged that the Debtors undervalued the tools for the first time at trial.  The Complaint contains no specific allegations that the Debtors did not disclose the true value and the extent of Mr. Isaacson's tools on Schedule B.  At best, Ms. Webb's very general allegation in the Complaint that the Debtors did not accurately disclose the value of their estate could be construed as encompassing the allegations raised at trial as to the tools.  *See* Compl. ¶ 54.

Further, no evidence supports Ms. Webb's contention this debt was actually owed to a water company or any other creditor. In fact, as a matter of general knowledge, waste water billing is dependant upon a customer's water usage, which is measured by a water meter reading. *See Residential Customer FAQs*, HAMPTON ROADS SANITATION DISTRICT, http://www.hrsd.com/residentialcustomer.shtml (last modified Jan. 2012). The Court therefore has no basis to question the veracity of Mrs. Isaacson's testimony at the Meeting of Creditors that the HRSD Debt for under-billed wastewater treatment services arose from a misreading of the Debtors' water meter. *See* Plaintiff's Exh. 24, Audio Recording. Accordingly, Ms. Webb has failed to establish that Mrs. Isaacson gave any false testimony at the Meeting of Creditors regarding the nature of the debt owed to HRSD. Thus, neither the failure of the Debtors to provide an account number for the HRSD Debt on Schedule F nor the testimony of Mrs. Isaacson at the Meeting of Creditors concerning the nature of the debt provide any basis to deny the Debtors' discharge pursuant to Section 727(a)(4)(A).

b. Did the Debtors Make a False Oath as to their Intention to Surrender their Jeep?

Ms. Webb contends that the Debtors made a false oath concerning their intention as to their Jeep on the basis that Mr. Issaacon's statement at the Meeting of Creditors that the Debtors intended to return their Jeep to the lienholder was inconsistent with the Debtors' Statement of Intention (which lists their intention as to the Jeep as "retain and pay"); their Schedule C, which reflects an exemption of $1.00 in the Jeep; and the Debtors' subsequent retention of the vehicle. Compl. ¶¶ 24-25. Mr. Isaacson's testimony at the Meeting of Creditors reveals that there was some confusion on his part regarding the Debtors' intention as to the Jeep. Plaintiff's Exh. 24. After Mr. Isaacson testified that the Debtors planned to return the Jeep, counsel for the Debtors reminded him that the Debtors had listed the vehicle as "retain and pay" in their bankruptcy

31

schedules, which prompted Mr. Isaacson to clarify his testimony by definitively stating that the

Debtors did intend to continue to retain and pay for the Jeep. *Id.* The subsequent remittance of

payments to the lienholder evidences the retention the vehicle. *See* Plaintiff's Exh. 20, Payment

Coupons; Answer ¶ 24. In their Answer, the Debtors addressed Ms. Webb's allegations as to the

testimony given at the Meeting of Creditors with the succinct statement that they "did not lie[,]

just had forgotten what we did at that moment[,] wasn't trying to be dishonest." Answer ¶¶ 24-

25. Mr. Isaacson's explanation at trial for this error mirrored the Debtors' response in the

Answer. As the Court earlier noted, a debtor will not be denied a discharge pursuant to Section

727(a)(4)(A) for an honest misstatement or inadvertent error. *Baye v. McEachern* (*In re*

*McEachern*), No. EC-07-1419-JuMoD, 2008 WL 8448836, at *4 n.7 (B.A.P. 9th Cir. Aug. 7,

2008) (slip copy). Here, the Court believes that Mr. Isaacson's initial misstatement as to the

Debtors' intention regarding the Jeep was simply the result of momentary confusion. Therefore,

with no evidence adduced to support a finding of fraudulent intent, the Court finds that Mr.

Isaacson's testimony as to the Jeep did not constitute a false oath. Further, even if Mr.

Isaacson's misstatement had been made with fraudulent intent, the misstatement was immaterial.

The immediate correction made to his initial misstatement extinguished any potential for his

testimony to adversely affect the ability of the trustee or creditors to investigate the Debtors'

assets and affairs. Accordingly, the Court concludes that Mr. Isaacson's testimony at the

Meeting of Creditors regarding the Debtors' intention as to the Jeep did not constitute a false

oath that would merit the denial of the Debtors' discharge pursuant to Section 727(a)(4)(A).

c.  Does the Omission of Any Former Businesses in Question 18 of the Statement of Financial Affairs Constitute a False Oath?

Ms. Webb appears to submit that the Debtors' discharge should be denied because they selected "None" in response to Question 18 of the Statement of Financial Affairs ("Question 18").[18]  Compl. ¶¶ 26-28; *see* Plaintiff's Exh. 23, Question 18 of the Statement of Financial Affairs.  Question 18 required the Debtors to disclose any sole proprietorship or self-employment in a trade, profession, or other activity, either full-or part-time, within the six years immediately preceding the filing date (July 12, 2011).[19]  Question 18 should therefore have solicited the disclosure of "Steve & Michelle Cabinet Shop" ("Cabinet Shop"), which the Business License and Mr. Isaacson's testimony establish was in operation during at least some, if not all, of the

---

[18]  Ms. Webb also appears to contend that the Debtors should have disclosed that "[Mr. Isaacson] has done business in the past six years with several companies that supply wood, paint, accessories, and tools" in their response to Question 18.  *See* Compl. ¶ 29.  The Isaacsons respond that Mr. Isaacson's involvement with other businesses was solely as a customer when Mr. Isaacson required supplies during the period when he performed "work after hours." Answer ¶ 29.  However, to the extent Ms. Webb contends by this allegation that the Debtors were required to disclose in response to Question 18 Mr. Isaacson's status as an employee of a business, such disclosure is not among those solicited in the Statement of Financial Affairs.  *See* n.19, *infra*.  Further, to the extent Ms. Webb alleges that Mr. Isaacson in some way independently affiliated with certain unspecified companies, such allegation is mere speculation in the absence of sufficient factual detail or other supporting evidence.

[19]  Question 18 provides as follows for individual debtors:

Nature, location and name of business
a.  *If the debtor is an individual*, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within **six years** immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within **six years** immediately preceding the commencement of this case.

Statement of Financial Affairs, Official Form 7 (revised 04/10) (emphasis in original).

year 2007.   Plaintiff's Exh. 4.   Ms. Webb also alleged in the Complaint that Mr. Isaacson

obtained business licenses in 2005 and 2006 to operate businesses in the City of Newport News,

Virginia, and the City of Hampton, Virginia, respectively ("2005/2006 Businesses").   Compl. ¶¶

27-28; *see also* n.10, *supra*.   The Debtors admitted in their Answer that Mr. Isaacson obtained

these business licenses, but denied that Mr. Isaacson was self-employed after early 2006 and

further asserted that this self-employment resulted in a net loss.   *See* n.10, *supra*.   Nevertheless,

Question 18 should also have solicited disclosure of the 2005/2006 Businesses.   The Court

therefore finds that the Debtors' selection of the box indicating "None" and failure to list any

businesses in response to Question 18 constitutes a false statement.

   The Court doubts that the omission of the Cabinet Shop and the 2005/2006 Businesses

(collectively the "Former Businesses") from Question 18 worked any actual detriment to Ms.

Webb, any other creditor, or the estate, given that disclosure of these defunct businesses would

have been unlikely to result in a more favorable outcome for any interested party.   As the Court

previously recognized, however, whether proper disclosure of omitted information would have

benefitted the estate or creditors has no relevance as to the materiality of a nondisclosure by a

debtor.   *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 251 n.19 (4th Cir. 1994).   The Court

must instead consider only whether the nondisclosure had an adverse effect on the ability of the

trustee and creditors, such as Ms. Webb, to gain a complete picture of the state of the Debtors'

financial affairs.   *See Jalajel v. Pugsley*, No. 1:11cv163, 2011 WL 1348312, at *2 (E.D. Va. Apr.

8, 2011).   Here, the nondisclosure of the Former Businesses in response to Question 18 is

material because the existence of any business—profitable, defunct, or otherwise—is germane to

the discovery of the Debtors' assets and state of their financial affairs, irrespective of whether

disclosure would have yielded a more favorable outcome for creditors or estate administration.

Accordingly, the Court finds that the Debtors' failure to disclose the Former Businesses in response to Question 18 is material.

Although the Debtors' omission of the Former Businesses is material, it does not constitute a false oath unless there is evidence that such omission was calculated to mislead the trustee and creditors or was part of a larger pattern of reckless indifference to the truth by the Debtors. *See Spencer v. Hatton* (*In re Hatton*), 204 B.R. 470, 475 (Bankr. E.D. Va. 1996), *aff'd*, 204 B.R. 477 (E.D. Va. 1996) (citing *Peoples Bank of Charles Town v. Colburn* (*In re Colburn*), 145 B.R. 851, 857 (Bankr. E.D. Va. 1992)). As there is no direct evidence of fraudulent intent before the Court, the Court must consider all of the facts and circumstances presented by the evidence and determine whether an inference of fraudulent intent on the part of the Debtors is warranted.

There is no evidence before the Court that the nondisclosure of the Former Businesses in response to Question 18 is part of a series of falsehoods in the Debtors' schedules and statements, which would demonstrate reckless disregard for the truth. Thus, the Court cannot infer fraudulent intent on that basis.

Relevant to the Court's inquiry into the Debtors' intent, however, is Mr. Isaacson's unprompted discussion at the Meeting of Creditors of the Cabinet Shop. *See* Plaintiff's Exh. 24, Audio Recording. Although subsequent disclosure of omitted information is not a panacea for a debtor's false oath, it is pertinent to a court's inquiry into the debtor's intent. *See Zitwer v. Kelly* (*In re Kelly*), 135 B.R. 459, 461-62 (Bankr. S.D.N.Y. 1992) (citing *MacLeod v. Arcuri* (*In re Arcuri*), 116 B.R. 873, 882 (Bankr. S.D.N.Y. 1990), *abrogated on other grounds by Grogan v. Garner*, 498 U.S. 279 (1991)). Numerous courts have held that a debtor's voluntary revelation

of undisclosed information at the meeting of creditors weighs against a finding of intent to

defraud:

> [I]n the context of actions to deny discharge under section 727, courts have found
> no intent to defraud in cases where debtors freely corrected inaccuracies and
> revealed information at later examinations or the meeting of creditors. *See
> Klingler v. Hosler* (*In re Hosler*), 309 B.R. 540, 550 (Bankr. [C.]D. Ill. 2004)
> (although there were omissions and inaccuracies in debtor's schedules, no intent
> to deceive was shown where corrections were made by debtor voluntarily at
> meeting of creditors and court found debtor to be credible); *Merena v. Merena* (*In
> re Merena*), 413 B.R. 792, 816 (Bankr. D. Mont. 2009) (debtor's inadvertent
> failure to list assets on her schedules did not rise to level of fraudulent false oath
> even though debtor did not disclose many items at meeting of creditors and did
> not promptly amend); *Nat'l Am. Ins. Co. v. Guajardo* (*In re Guajardo*), 215 B.R.
> 739, 741-42 (Bankr. W.D. Ark. 1997) (debtor's false oath was not made with
> fraudulent intent where he voluntarily offered corrections and explanations later
> in examination); *Baker v. Mereshian* (*In re Mereshian*), 200 B.R. 342, 347
> (B.A.P. 9th Cir. 1996) (there was no intent to defraud by debtor where he failed to
> list certain transactions but revealed them at meeting of creditors); *First Sec. Bank
> of Helena v. Hirengen* (*In re Hirengen*), 112 B.R. 382, 385-86 (Bankr. D. Mont.
> 1989) (discharge was not denied where schedules contained inaccuracies but
> where it was apparent in testimony in creditor's meeting that debtor did not intend
> concealment of assets but was unsophisticated and poorly counseled in proper
> completion of bankruptcy papers); *Northeast Alliance Fed. Credit Union v.
> Garcia* (*In re Garcia*), 260 B.R. 622, 631 (Bankr. D. Conn. 2001) (when
> evaluating knowledge of a false statement a court may consider debtor's
> education, business experience and reliance on counsel).

*In re Mims*, No. 10-52281-KMS, 2011 WL 1749809, at *4 n.9 (Bankr. S.D. Miss. May 6, 2011)

(slip copy).  In *In re Kelly*, the debtor filed schedules prepared on his behalf by counsel that

failed to disclose his ownership of two vehicles.  *In re Kelly*, 135 B.R. at 460.  Subsequently, at

the meeting of creditors, the debtor denied ownership of the vehicles because he feared that the

vehicles would be immediately seized if he testified truthfully, was unprepared by counsel for his

testimony at the meeting of creditors, and felt intimidated by the trustee.  *Id*.  However,

following the meeting of creditors, the debtor's conscience prompted him to advise the trustee of

the falsities, which led to the sale of both vehicles for the benefit of the estate.  *Id.* at 461.  In

addition to finding the debtor's misunderstanding of the information required by the schedules to be believable, the court concluded that the debtor's later voluntary admission of ownership of the vehicles weighed against a finding of fraudulent intent, distinguishing the debtor's admission from "a case where the Trustee independently discovered the fraud and confronted the debtor who buckled under the weight of discovered truth, forced to acknowledge his guilt." *Id.* at 463.

Similarly, in the instant case, Mr. Isaacson freely revealed at the Meeting of Creditors that he had operated his own business as recently as 2007. Plaintiff's Exh. 24, Audio Recording. Mr. Isaacson did not reveal this information in response to a direct question regarding any past or present business interests or self-employment, but rather in response to a question from the Chapter 7 Trustee as to his estimate of the value of the tools he owned at the time of the filing of the bankruptcy case. *Id.* In this portion of Mr. Isaacson's testimony, he disclosed that he sold most of his large tools when he closed his business in 2007. *Id.* Further, not unlike to the debtor in *In re Kelly* who approached the trustee to disclose the inaccuracies in his schedules and testimony, Mr. Isaacson voluntarily disclosed details regarding the Cabinet Shop and is thus distinguishable from a debtor who only reveals the truth when faced with suspicion. To be sure, Mr. Isaacson's disclosure of the Cabinet Shop at the Meeting of Creditors was not motivated by a desire to correct a false oath, but occurred instead as part of a detailed response to a question on an unrelated topic. The Court believes, however, that the context of Mr. Isaacson's disclosure of this business supports an inference of innocent intent. If the Debtors had intended to prevent creditors and parties in interest from discovering the Cabinet Shop or the 2005/2006 Businesses by omitting them from Question 18, then it is highly improbable that Mr. Isaacson would have so nonchalantly admitted at the Meeting of Creditors, in the presence of his attorney, the Chapter 7 Trustee, and Ms. Webb, that he had operated a business as recently as 2007. Instead, Mr.

37

Isaacson's testimony as at the Meeting of Creditors suggests to the Court that the Debtors failed to understand that this information is among the information solicited by Question 18. Moreover, the Debtors' apparent misconceptions that unprofitable businesses need not be disclosed and that "side jobs" undertaken secondary to regular employment do not constitute being "in business" or self-employed, *see* Answer ¶¶ 26, 28, further convince the Court that the nondisclosure of the Former Businesses is attributable to the Debtors' lack of sophistication and understanding of the type of information solicited by Question 18.[20]   Accordingly, the Court finds that the Debtors did not possess the requisite fraudulent intent with respect to the omission of the Former Businesses from the Debtors' response to Question 18.   The Court therefore concludes that the failure of the Debtors to list any businesses in response to Question 18 does not warrant the denial of the Debtors' discharge pursuant to Section 727(a)(4)(A).

d.   Did the Debtors Fail to Accurately Disclose their Income in their Bankruptcy Schedules?

Ms. Webb contends in the Complaint that the Debtors did not accurately disclose their income.  Compl. ¶ 34.  The Complaint does not contain any specific allegations as to unreported sources of income or that the Debtors earn wages higher than those reported in the bankruptcy schedules.   Based upon the testimony and evidence presented at trial, Ms. Webb apparently believes that Mr. Isaacson was performing "side jobs" as of the petition date and the Debtors' bankruptcy schedules do not reflect income from such self-employment.  Ms. Webb has failed, however, to adduce sufficient evidence to elevate her allegations beyond mere conjecture.

---

[20] The Court notes that Shanna C. Harris, counsel for the Debtors in the main bankruptcy case, was present at the Meeting of Creditors when Mr. Isaacson discussed the Cabinet Shop. *See* Plaintiff's Exh. 24, Audio Recording.  However, the Court's docket does not reflect any attempt by Ms. Harris to amend the Debtors' response to Question 18 in light of the information revealed by Mr. Isaacson at the Meeting of Creditors.  The Court is loath to expect the Debtors to recognize that the Former Businesses must be disclosed in response to Question 18 when Ms. Harris herself apparently failed to realize that an amendment to the Debtors' response to Question 18 was necessary.

Ms. Webb attempted to prove this allegation by the testimony of Joseph Hawkins, who arranged a meeting with Mr. Isaacson in August 2011 to discuss the possibility of additional cabinet work at his residence because Mr. Isaacson was responsible for the original installation of his kitchen cabinets.  It is undisputed that the meeting did not take place and no work was done by Mr. Isaacson for Mr. Hawkins.  It was Mr. Isaacson's testimony that, had such meeting occurred, his objective would only have been to procure the job for the benefit of his employer, Virginia Maid Kitchens, Inc.  Ms. Webb also introduced her own testimony from the Meeting of Creditors where she speculated that the Isaacsons had undisclosed income.[21]  *See* Plaintiff's Exh. 24, Audio Recording.  It would also appear that Ms. Webb might seek to rely upon Ms. Viviani's retention of Mr. Isaacson in 2010 to repair her cabinets as evidence that the Debtors have unreported income attributable to "side jobs" performed by Mr. Isaacson.  The Court cannot extrapolate a finding that Mr. Isaacson continued to perform "side jobs" as of the petition date (July 12, 2011) from evidence that he performed work for Ms. Viviani in 2010.  At trial, Mr. Isaacson's testimony that he had not undertaken any "side jobs" in 2011 or 2012 was uncontroverted.  Accordingly, there is no basis to conclude that the Debtors made a false oath as to their income, and the Court finds that to deny discharge pursuant to Section 727(a)(4)(A) is unfounded.

---

[21]  At the Meeting of Creditors, the Chapter 7 Trustee informed Ms. Webb that, based upon the documentation and evidence presented, he believed the bankruptcy case was a "no asset case."  *See* Plaintiff's Exh. 24, Audio Recording.  The Trustee advised Ms. Webb that she may summarize her allegations regarding potential undisclosed income in a letter and that such letter must be accompanied by specific information or documentation.  *Id.*  The Court's docket reflects that the trustee has not filed an adversary proceeding or any other pleading with respect to Ms. Webb's allegations of undisclosed income.  The Report of No Distribution was filed in the Debtors' main bankruptcy case on October 18, 2011.

e.  Did the Debtors Fail to Disclose the Extent and Value of Mr. Isaacson's Carpentry Tools in
their Bankruptcy Schedules?

In the Complaint, Ms. Webb generally contends that the Debtors failed to accurately disclose the value of their estate.  Compl. ¶ 54.  At trial, Ms. Webb more specifically alleged that the Debtors failed to disclose all of Mr. Isaacson's carpentry tools in their bankruptcy schedules.[22]  The Debtors, among their other personal property detailed on Schedule B, listed: "Hand Tools $100.00."  Compl. Exh. 9.  Mr. Isaacson testified that at the time of the Cabinet Contract he owned a table saw, a shop saw, a compressor, an arm saw and various drills.  Mr. Isaacson further testified that he disposed of the majority of his tools after he abandoned the Cabinet Shop business subsequent to the cancellation of the Cabinet Contract by Ms. Webb and only retained some aged hand tools, which appear to be listed on his Schedule B.  Such testimony was consistent with the testimony given by Mr. Isaacson at the Meeting of Creditors.  *See* Plaintiff's Exh. 24, Audio Recording.  Thus, there is no credible evidence that the Debtors committed a false oath by failing to disclose the true value and extent of the tools owned by Mr. Isaacson at the time of the filing of the bankruptcy case.

---

[22] At the Meeting of Creditors, Ms. Webb also alleged that Mr. Isaacson undervalued his tools on Schedule B.  Plaintiff's Exh. 24, Audio Recording.  As Ms. Webb did not present any evidence to controvert Mr. Isaacson's testimony that he sold all of his large tools in 2007 upon abandoning the Cabinet Shop, the Chapter 7 Trustee advised Ms. Webb that he intended file a Report of No Distribution after the expiration of thirty days following the Meeting of Creditors, but invited her to summarize her allegations in a letter and instructed that the letter must be accompanied by specific information or documentation.  *Id.*  The Court's docket reflects that the Trustee has not filed an adversary proceeding or any other pleading with respect to Ms. Webb's allegations.  The Report of No Distribution was filed in the Debtors' main bankruptcy case on October 18, 2011.

2.  Section 727(a)(4)(B)

Ms. Webb appears to contend that the Viviani Claim listed on Schedule F in the amount

of $3,800.00[23] is a "fraudulent debt," because the Debtors misclassified the debt as "Fees" on

Schedule F and Ms. Viviani had expressed no intention to initiate a legal proceeding to collect

the debt.  Compl. ¶¶ 17-19.  The interests of public policy demand that "debtors not omit

*potential* creditors from their schedules and notices."  *Zurich Am. Ins. Co. v. Tessler* (*In re J.A.*

*Jones, Inc.*), No. 3:06CV6-MU, 2006 WL 983896, at *2 (W.D.N.C. Apr. 12, 2006) (quoting

Order to Extend Claims Bar Date to Permit Late-Filed Proof of Claim, No. 03-33532 (Bankr.

W.D.N.C. Dec. 20, 2005)) (emphasis added).  The Bankruptcy Code provides, in relevant part,

that "creditor" means "an entity that has a claim against the debtor that arose at the time of or

before the order for relief concerning the debtor."   11 U.S.C. § 101(10)(A).   Further, the

Bankruptcy Code defines a "claim" as a:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated,
> unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,
> equitable, secured, or unsecured; or

> (B) right to an equitable remedy for breach of performance if such breach gives
> rise to a right to payment, whether or not such right to an equitable remedy is
> reduced to judgment, fixed, contingent, matured, unmatured, disputed,
> undisputed, secured, or unsecured.

11 U.S.C. § 101(5). Congress intended that the meaning of "claim" be broadly construed.  *See*

*Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991).  Section 727(a)(4)(B) of the Bankruptcy

Code prohibits the granting of a discharge to a debtor who "knowingly and fraudulently, in or in

connection with the case presented or used a false claim." 11 U.S.C, § 727(a)(4)(B).  As Judge

Davis has observed:

---

[23] The debt was not listed as contingent, unliquidated, or disputed.  Plaintiff's Exh. 17,
Schedule F.

41

> This provision of the Code is sparsely used. *Hendon v. Oody* (*In re Oody*), 249
> B.R. 482, 487 (Bankr. E.D. Tenn. 2000) ("There is little case law applying §
> 727(a)(4)(B)."). The courts that have considered objections to discharge for
> presenting a false claim have required the plaintiff to prove that the debtor
> "presented or used an inflated or fictitious claim." *Id.* (citations omitted). Such
> cases generally involve the scheduling of non-existent debts, the scheduling of
> inflated debts, or the filing by the debtor of a false proof of claim. *Parnes v.
> Parnes* (*In re Parnes*), 200 B.R. 710, 722 (Bankr. D. Ga. 1996) (citing *Garcia v.
> Garcia* (*In re Garcia*), 168 B.R. 403 (D. Ariz. 1994)). For purposes of §
> 727(a)(4)(B), a claim is defined by § 101(5) to mean a "right to payment" or a
> "right to an equitable remedy for breach of performance if such breach gives rise
> to a right of payment." 11 U.S.C. § 101(5)(A) and (B). A § 727(a)(4) violation,
> in order to be actionable, requires both intentionality and materiality. *In re
> Natale*, 136 B.R. at 349. At least one bankruptcy court has denied the debtor's
> discharge under § 727(a)(4)(B) where it found that the overstatement of a secured
> claim was a material falsity because it created "a mistaken belief that the liens
> against the debtors' residence exceeded its fair market value by $25,000.00."
> *Pigott v. Cline* (*In re Cline*), 48 B.R. 581, 585 (Bankr. E.D. Tenn. 1985).

*Scheidelman v. Henderson* (*In re Henderson*), 423 B.R. 598, 619 (Bankr. N.D.N.Y. 2010). In

rejecting the plaintiff's argument that the debtor scheduled certain false claims, the court in *In re*

*Henderson* relied on evidence that the debtor "legitimately believed" he was owed damages

under a construction contract and that certain claims were not scheduled as contingent,

unliquidated, or disputed. *Id.* at 620.

The scheduling of the Viviani Claim appears to be neither intentionally fraudulent nor

material. Ms. Viviani testified that she paid approximately $3,500.00 of the $3,875.00 contract

price to Mr. Isaacson for the repair of her cabinets, but stopped payment on the remaining

balance and discharged Mr. Isaacson on the advice of her insurance carrier. The fact that Ms.

Viviani does not believe she has a claim against Mr. Isaacson (presumably because her insurance

company paid for her kitchen to be repaired and completed notwithstanding the alleged default

by Mr. Isaacson) does not suffice to prove the scheduling of the Viviani Claim was in any

manner fraudulent. Mr. Isaacson testified at trial that he scheduled the Viviani Claim because he

was concerned that there may be a lawsuit due to her dissatisfaction with his work.   This

testimony was consistent with the Debtors' response in their Answer that describes Ms. Viviani

as "another debt" and "someone he owes money to, but she says [he] doesn't owe her anything."

Answer ¶¶ 18-19.   In the Court's view, the Debtors "legitimately believed" that a debt existed,

regardless of Ms. Viviani's representations to the contrary.   Moreover, the Debtors did not list

the Viviani Claim as contingent, unliquidated or disputed, which underscores the conclusion that

they held a legitimate belief the debt was valid.   It is both logical and prudent for the Debtors to

have included the Viviani Claim as a scheduled indebtedness in their bankruptcy so Ms. Viviani

could assert any claims she held against Mr. Isaacson.   Further, there is no evidence that the

inclusion of the Viviani Claim was for any fraudulent purpose.   As such, no violation of Section

727(a)(4)(B) has occurred here.   Although there appears to be no cogent explanation for the

scheduling of the nature of the Viviani Claim as "Fees," there is no evidence of fraudulent intent

on the part of the Issacsons in misidentifying the nature of the debt they believed they owed to

Ms. Viviani.   The mislabeling also does not appear to be material as it is extremely unlikely to

hinder a creditor's ability to evaluate the Debtors' financial affairs.   Accordingly, the Court

concludes that the Vivani Claim does not constitute a false claim pursuant to Section

727(a)(4)(B).

### 3.   Sections 727(a)(2) and 727(a)(5)

To the extent Ms. Webb asserts by her allegations that the Issacsons failed to disclose

their true income and failed to disclose the true value and extent of Mr. Isaacson's tools, as

summarized, *supra*, and, thus, that the Debtors should be denied their discharge pursuant to

Sections 727(a)(2) and 727(a)(5), such claims for relief must fail.   Under Section 727(a)(2), a

court may a deny debtor his Chapter 7 discharge if:

43

[T]he debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2). Additionally, a court may deny a debtor's discharge pursuant to Section 727(a)(5) if "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." *Id.* § 727(a)(5). The sufficiency of a debtor's explanation for such loss or deficiency is a question of fact. *Chalik v Moorefield* (*In re Chalik*), 748 F.2d 616, 619 (11th Cir. 1984).

The Court already determined, *supra*, that there is no credible evidence to support Ms. Webb's contention that Mr. Isaacson currently has or had at the time of the petition unreported income attributable to "side jobs." Further, the Court has also concluded, *supra*, that the tools reported on Schedule B constitute the true value and extent of all of the tools owned by Mr. Isaacson based upon his uncontroverted and credible testimony at trial and the testimony offered at the Meeting of Creditors that he sold the majority of his large tools after abandoning the Cabinet Shop business in 2007. *See* Plaintiff's Exh. 24, Audio Recording. Accordingly, to the extent Ms. Webb requests the Court deny the Debtors' discharge pursuant to Sections 727(a)(2) and 727(a)(5), such claims must be dismissed.

4. Was the Ace Cash Express Debt a "Questionable Act" Sufficient to Deny the Isaacsons' Discharge Pursuant to Section 727?

Ms. Webb contends that the scheduled debt to Ace Cash Express ("Ace") was incurred as the result of a "questionable act," which disqualifies the Debtors from receiving a discharge,

presumptively because the Debtors should have used a less expensive source of credit or should not have tried to cash the check, which was subsequently dishonored by Ms. Viviani's financial institution after she stopped payment on the item.  *See* Compl. ¶ 20.  At trial, Ms. Webb introduced correspondence from Ace to Mr. Isaacson, which makes demand for repayment of funds advanced by Ace on account of the dishonored check.  *See* Plaintiff's Exh. 18, Returned Check Notification.  Whatever the wisdom of Mr. Isaacson's use of Ace's check cashing services, Ms. Webb's allegations that the incurrence of the debt to Ace Cash Express was a "questionable act" fails to implicate any legal basis for the denial of the Debtors' discharge pursuant to Section 727(a).

C.  Were the Debtors Ineligible to File a Case Under Chapter 7 of the United States Bankruptcy Code?

At trial, Ms. Webb alleged, for the first time, that the Debtors were ineligible to file a case under Chapter 7 of the Bankruptcy Code on the basis that the Debtors' combined income exceeds the median family income for Virginia residents of a similar family size.  Ms. Webb's argument in this regard oversimplifies the calculation required under 11 U.S.C. § 707(b).  Under Chapter 7 of the Bankruptcy Code, debtors whose current monthly income exceeds the median family income in the applicable state for a family of similar size must pass the "Means Test" set forth in Section 707(b)(2) to be eligible to file a Chapter 7 bankruptcy case.  *See* 11 U.S.C. § 707(b)(7); *see also U.S. Trustee v. Deadmond* (*In re Deadmond*), No. CV 07-15-H-CCL, 2008 WL 191165, at *1 n.1 (D. Mont. Jan. 22, 2008) (unreported decision) ("Only those debtors whose income exceeds the median income for the relevant household size in the state in which the debtors reside must satisfy the Means Test.").  The Means Test was instituted by Congress through a revision of Section 707(b) pursuant to the Bankruptcy Abuse Prevention and

Consumer Protection Act of 2005, which reformed consumer bankruptcy law.  This amendment

requires prospective Chapter 7 debtors whose current monthly income exceeds the relevant

median family income, otherwise known as "above-median debtors," to file under Chapter 13 of

the Bankruptcy Code cases if the Means Test calculation indicates they are able to at least

partially repay creditors.  *Timothy v. Anderson* (*In re Timothy*), 442 B.R. 28, 32 (B.A.P. 10th Cir.

2010).  Judge Mitchell summarized the application of the Means Test as follows:

> The test seeks to ensure that debtors who can afford to repay at least a portion of
> what they owe their creditors do not abuse the bankruptcy process by filing
> under chapter 7.  Under the means test a presumption of abuse arises if the
> debtor's "current monthly income," minus certain specified allowances and
> expenses, multiplied by 60, exceeds $6,575 (provided that would pay at least
> 25% of nonpriority unsecured claims), or $10,950, regardless of the amount of
> the claims.  § 707(b)(2), Bankruptcy Code.  Although the presumption of abuse
> can be rebutted, it requires a showing of special circumstances.  § 707(b)(2)(B),
> Bankruptcy Code. However, the presumption of abuse only applies if the
> debtor's current monthly income exceeds the state-wide median income for a
> household of the same size.  § 707(b)(7), Bankruptcy Code.  "Current monthly
> income" is defined as the average of the debtor's income from all sources (with
> certain exceptions, such as Social Security benefits) received in the six months
> *preceding* the month in which the petition is filed.  § 101(10A), Bankruptcy
> Code.  Thus current monthly income determines whether the debtor is subject to
> means testing at all, and, if so, is the starting point for the calculation to
> determine whether, after the permitted deductions, there is a presumption of
> abuse.

*Silvers v. Alanya* (*In re Alanya*), Adv. No. 09-1452, 2010 WL 5348728, at *5 (Bankr. E.D. Va.

Dec. 21, 2010) (slip copy).[24]

In the instant matter, the Debtors' annualized current income did exceed the Virginia

median income for a household of two.[25]   Consequently, the Debtors were then required to

---

[24] The Court notes that the amounts specified for the Means Test calculation in Section
707(b)(2)(A)(i)(I) and (II) were adjusted from $6,575.00 and $10,950 to $7,025.00 and
$11,725.00, respectively, for cases filed on or after April 1, 2010, pursuant to 11 U.S.C. § 104.

[25] On the Chapter 7 Statement of Current Monthly Income and Means Test Calculation
(Official Form 22A) filed with their bankruptcy petition, the Debtors listed their annualized

complete the Means Test calculation whereby they deducted from their current monthly income their (1) monthly expenses as specified under the National Standards and Local Standards (as issued by the Internal Revenue Service); (2) actual monthly expenses for the categories specified by the Internal Revenue Service as Other Necessary Expenses for the area where the Debtors reside as of the date of the order for relief; (3) health insurance expenses; (4) an additional allowance for food and clothing; and (5) payments on secured and priority debt. *See* Voluntary Petition, Chapter 7 Statement of Current Monthly Income and Means-Test Calculation, 11-51273-SCS (Bankr. E.D. Va. July 12, 2011), ECF No. 1; *see also* § 707(b)(2)(A).   After deduction of these permitted expenses, the Debtors had no monies available to repay their creditors.[26]   Accordingly, because the Debtors' Means Test calculation did not invoke a presumption of abuse, they were permitted to proceed with their filing under Chapter 7 of the Bankruptcy Code.  Therefore, Ms. Webb's argument that the Debtors were ineligible to file a Chapter 7 bankruptcy petition is without merit.

## IV. Summary

The angst and displeasure of Ms. Webb here engenders the sympathy and understanding of this Court.  Few matters that find their way to Bankruptcy Court seem to generate more antipathy than a defaulted construction job on a personal residence.  Notwithstanding the amount at issue here, this Court has exhaustively examined the allegations and evidence submitted by

---

current monthly income for the purposes of Section 707(b)(7) as $65,973.48 and the applicable Virginia median family income for a household of two as $63,613.00.  To the extent Ms. Webb alleges that the Debtors' annualized current monthly income is understated, the Court has already determined, *supra*, that there is no evidence to suggest that the Debtors did not accurately report their income.

[26] The Debtors were permitted under 11 U.S.C. § 707(b)(2)(A)(ii) and (iii) to deduct expenses of $5,875.01 from their current monthly income of $5,497.79, resulting in a deficiency of $377.22 per month.

Ms. Webb.  History shows this Court does not shrink from the fulfillment of its duty to deny a discharge to a debtor where the evidence and the law demand it.  *See Johnson-Clayton v. Ferebee* (*In re Ferebee*), Adv. No. 10-07086-SCS, 2012 WL 506740 (Bankr. E.D. Va. Feb. 15, 2012) (slip copy).  There is no unfair manipulation of the bankruptcy system by the Debtors here. Rather, it is the fundamental premise of the system that draws the ire of Ms. Webb, which is the ability of a non-fraudulent or manipulative debtor to discharge otherwise justly due and owing debts, including debts incurred for the breach of a contract.  After such intensive scrutiny, there simply is no legal basis to deny the discharge of the Steven Isaacson Debt or to generally deny the discharge of the Debtors.  A separate Order dismissing the Complaint will be entered by the Court.

Ms. Webb is advised that an appeal lies from this matter to the United States District Court for the Eastern District of Virginia.  Except as provided in Federal Rules of Bankruptcy Procedure 8002(b) and 8002(c), any notice of appeal must be filed with the Clerk of this Court within fourteen (14) days of the date of entry of the order to be entered by the Court.  The filing fee for a notice of appeal is $298.00.

The Clerk is directed to mail a copy of this Memorandum Opinion to the Plaintiff, Regina Webb; the Debtors, Steven and Michelle Isaacson; Kim A. Lewis and Shanna C. Harris, counsel for the Debtors in the main bankruptcy case; David R. Ruby, Chapter 7 Trustee; and to Debera F. Conlon, Assistant United States Trustee.

Entered in the Eastern District of Virginia on this 22nd day of August, 2012.

STEPHEN C. ST. JOHN
United States Bankruptcy Judge

48